MCKOOL SMITH P.C.
Peter S. Goodman (PG-3939)
Sachin S. Bansal (SB-0283)
One Bryant Park, 47th Floor
New York, NY 10036
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

– and –

MCKOOL SMITH P.C.
Basil A. Umari (*pro hac vice*)
Nicholas Zugaro (*pro hac vice*)
600 Travis, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

*Counsel to the Liquidating Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
<u>In re</u>                                                 :    Chapter 11 Case No.
:
**BEARINGPOINT, INC., <u>et</u> <u>al.</u>,**                        :    09 - 10691 (REG)
:
Debtors.                                                     :    (Jointly Administered)
:
---------------------------------------------------------------x
:
**JOHN DeGROOTE SERVICES, LLC,**                             :
:
    **Plaintiff**                                              :
:
vs.                                                          :    Adversary No. _____
:
**CARTUS CORPORATION,**                                      :
:
    **Defendant.**                                             :
---------------------------------------------------------------x

**COMPLAINT TO AVOID AND RECOVER**
**PREFERENTIAL TRANSFERS PURSUANT TO**
**<u>11 U.S.C. §§ 547 AND 550</u>**

John DeGroote Services, LLC, in its capacity as Liquidating Trustee of the BearingPoint, Inc. Liquidating Trust (the "Liquidating Trustee") files this Complaint to Avoid and Recover Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550, and in support thereof asserts as follows.

## JURISDICTION AND VENUE

1. This adversary proceeding arises in the jointly-administered chapter 11 cases of the above-referenced Debtors now pending in this Court (the "Bankruptcy Cases").

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 547 and 550.

3. Venue of this adversary proceeding lies in the Bankruptcy Court for the Southern District of New York pursuant to 28 U.S.C. § 1409.

4. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(F). This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## PARTIES

5. On February 18, 2009 (the "Petition Date"), BearingPoint Inc. ("BearingPoint") and certain of its affiliated subsidiaries (collectively with BearingPoint, the "Debtors") filed voluntary petitions for relief under Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), jointly administered under Case No. 09-10691 (REG).

6. By Order entered December 22, 2009, the Bankruptcy Court confirmed the Debtors' Modified Second Amended Joint Plan Under Chapter 11 of the Bankruptcy Code, dated December 17, 2009 (the "Plan"). The Plan has become effective by its terms.

7.      Pursuant to Article 5.7 of the Plan, a "Liquidating Trust" was created pursuant to the Liquidating Trust Agreement ("Trust Agreement").  Pursuant to the Trust Agreement and the Plan, John DeGroote Services, LLC was appointed Liquidating Trustee of the Liquidating Trust.

8.      Pursuant to Article 5.7 of the Plan, the Debtors' avoidance actions under Chapter 5 of the Bankruptcy Code were transferred to the Liquidating Trust.  Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Trustee is authorized to enforce, prosecute, settle or compromise any and all such claims.

9.      Accordingly, the Liquidating Trust owns, and the Liquidating Trustee is entitled to prosecute, the claims asserted in this lawsuit.

10.     John DeGroote Services, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 100 Crescent Court, Suite 700, Dallas, Texas, 75201.

11.     Cartus Corporation ("Cartus") is a corporation organized under the laws of Delaware with its principal place of business at 40 Apple Ridge Road, Danbury, CT 06810-7301. Cartus will be served by certified mail addressed to Cartus' registered agent: Corporation Service Company, 50 Weston St., Hartford, CT 06120-1504.

## BACKGROUND FACTS

**I.    The Relocation Management Agreement Between the Parties**

12.     On June 22, 2001, BearingPoint and Cartus entered into a Relocation Management Agreement (the "Agreement").[1]  Under the Agreement, Cartus served as the sole provider of a wide range of employee relocation services to all BearingPoint employees.  These

---

[1] At the time of execution in 2001, both parties were doing business under different names.  BearingPoint was known as KPMG Consulting, Inc., and Cartus was known as Cendant Mobility Services Corporation (a subsidiary of Cendant Corporation).

services encompassed temporary and permanent moves both domestically and internationally, including, but not limited to, preparing necessary documentation, making foreign tax payments, authorizing and arranging subcontracting services consistent with BearingPoint's policies, managing and paying vendors (e.g. real estate agents, moving services, mortgage assistance, approving relocation expenses), arranging home sales and home purchases, packing and shipping household goods, and providing cross-border cultural and language training. For example, if a BearingPoint employee was being moved from the United States to a foreign country, then Cartus opened a "file" or "ticket" on that employee, and served as the paying agent to locate and arrange for temporary (and if needed, permanent) housing, provide airfare and ground transportation, and pack and ship all of an employee's personal belongings.

## II. Cartus' Undue and Coercive Pressure On BearingPoint to Enter Into a Letter of Credit On an Expedited Basis and On Favorable Terms to Cartus

13. In mid-October 2008, based on Cartus' concerns regarding the nature of BearingPoint's financial condition, Cartus demanded a modification to the then-current billing arrangement with BearingPoint where Cartus' fees were due within 30 days from the date of invoice, which Cartus sent on a consolidated monthly basis. Agreement, ¶ 8. Instead, Cartus compelled BearingPoint to secure approximately $1.6 million[2] through a pre-paid funded account and threatened to stop service if BearingPoint failed to comply. While it was unclear to BearingPoint whether Cartus would abruptly stop relocation and related services in progress, or complete those already underway and stop authorizing any new services, a cessation in services would be disruptive to BearingPoint's domestic and international relocations, and hinder its ability to leverage new business opportunities. For example, one specific and significant

---

[2] Cartus based this calculation on its own formula as follows: three months of invoice payments, with each month at about $549,000, according to their records, but at 150% and an internal credit risk assessment at 100%. Thus, 150% of $549,000 equaled $823,500, which was doubled for Cartus' stated credit risk factor, for a total of $1,647,000.

implication of a stop in services would be Cartus not making any foreign tax payments on BearingPoint's behalf. This would trigger inquiries from foreign tax authorities to BearingPoint, but without sufficient company personnel to address the increased correspondence. Furthermore, BearingPoint would incur late payment penalties and interest as it scrambled toward finding an alternative provider. In addition, BearingPoint had previously worked closely with Cartus to establish a unique mechanism by which Cartus could obtain necessary documentation in the earlier stages of employees' cross-border travels and protect BearingPoint's interests, but BearingPoint would not be in a position to instantaneously assume such services in the event of a termination.

14. In response to Cartus' demands, on October 20, 2008, BearingPoint offered to either (1) execute a standby letter of credit ("LC") in favor of Cartus; or (2) enter into a zero-based account approach where Cartus would bill BearingPoint for imminent and foreseeable expenses for which BearingPoint would directly pay to Cartus. Accordingly, BearingPoint was willing to modify the Agreement, but with the flexibility to allow Cartus to be the first in proposing the necessary modifications to the Agreement.

15. On October 22, 2008, Cartus rejected the notion of a zero-based account approach, or any other compromise, and instead insisted that BearingPoint immediately issue a new LC for $1.6 million in exchange for Cartus continuing to fulfill its relocation services obligations under the Agreement. This began a pattern and practice by Cartus—a critical vendor to BearingPoint—of coercion and pressure on BearingPoint to execute the LC in the most favorable terms to Cartus and on an expedited timetable that best served Cartus' business interests. For BearingPoint, this created a significant and unnecessary distraction for

5

BearingPoint's senior management, and additional and unnecessary cash pressure on BearingPoint itself, at a time when the company's financial condition was deteriorating.

16. For example, on or around October 22, 2008, Cartus immediately demanded that BearingPoint issue the LC in a matter of days, but was certainly aware that obtaining an LC for an organization of BearingPoint's size and complexity would require a reasonable time to achieve lender approval and conduct the necessary internal review. Moreover, a $1.6 million one-time payment was an exception to BearingPoint's customary payment practices for its vendors, including Cartus. Regardless, BearingPoint escalated the need for an LC at $1.6 million to the highest levels, including its CEO, coordinated with Wells Fargo,[3] and was able to obtain and send a draft LC for $1.6 million to Cartus in barely a week.

17. By November 6, 2008, Cartus admitted that it had been responsible for the delay in finalizing the draft LC, and that it would allow BearingPoint additional review time. For the next two weeks, Cartus engaged BearingPoint in a number of back-and-forth revisions to the LC, thereby imposing an inexplicable self-slowdown to execute an LC that Cartus had purportedly needed on an expedited basis. In the interim, BearingPoint continued to work toward a good-faith delivery of the LC in a reasonably brief timeframe by providing its responses within one or two business days compared to Cartus, whose response times had consistently been lengthier than BearingPoint—again contrary to Cartus' representations that execution of the LC was urgent.

18. Starting on or about November 20, 2008, and until about December 17, 2008, Cartus' written proposals to the LC to address the interplay of the LC in the event of a BearingPoint bankruptcy resulted in significant debate. Specifically, BearingPoint disputed

---

[3] The LC would be issued under BearingPoint's $200 million non-funded credit facility with Wells Fargo. The LC would be fully cash collateralized with repayments made to the credit facility.

6

Cartus' proposal to insert a provision in the LC that permitted Cartus to draw down the *entire* amount of Cartus' exposure on preference payments (i.e. $1.6 million) following 45 days from the date of a BearingPoint bankruptcy petition. Cartus' stated rationale for such a provision represented a clear admission of Cartus' awareness that BearingPoint's payments within a 90-day period preceding a bankruptcy filing would constitute preference payments. Cartus, instead, sought to avoid any uncertainty involving a preference by permitting Cartus to draw down for the full amount under the LC. Cartus' request for the preference-related provision was clearly intended to insulate Cartus from any future preference action brought by BearingPoint.

19. Cartus' proposed provision to draw the entire $1.6 million in the event of a bankruptcy was wholly inconsistent with BearingPoint's executed and contemplated LCs, and simply unacceptable to BearingPoint. Instead, BearingPoint suggested that Cartus could disgorge the actual payments that BearingPoint made to Cartus within the 90 days before a bankruptcy petition, *i.e.*, Cartus' draw on the LC would not exceed the amount BearingPoint paid within the 90 day period. Intransigently, Cartus expressly rejected such a compromise, and negotiations between the parties regarding the LC stalled.

### III. Cartus' Accelerated Termination of the Agreement

20. On Thursday, December 18, 2008, just prior to the holidays, and as a result of BearingPoint's disagreement regarding Cartus' proposals to insert preference-related provisions into an LC, Cartus sent a notice to BearingPoint for immediate termination of the Agreement. The termination notice took BearingPoint by surprise, especially given BearingPoint's positive payment history and good faith efforts to provide a number of reasonable financial assurance measures for Cartus. BearingPoint faced significant hardship and expense due to Cartus'

immediate termination and suspension of relocation services, particularly before the end of the fiscal, tax and calendar year.

21. Cartus rejected BearingPoint's proposed solutions to the parties' dispute, such as a stay of termination, or mutually agreeable preference-related provisions in the LC or a deposit arrangement. BearingPoint stated that it would exercise all available legal remedies, including withholding payment owed on the ground that Cartus may have breached the Agreement by an immediate termination without an appropriate basis.[4] Only then did Cartus resume negotiations with BearingPoint, but did not pursue an LC with the extraordinary preference-related provision.

22. On or about December 19, 2008, Cartus agreed to transition of certain ongoing services (but would not undertake any new activity) if BearingPoint wired a payment of $1,446,518.00 ("December Wire Payment"). According to a December 19, 2008 e-mail from Eric Barnes, CFO of Cartus to Jason Porter, Corporate Controller of BearingPoint, the December Wire Payment consisted of $671,250 in outstanding amounts invoiced by Cartus, and a deposit for $775,268 (of which, $450,268 was for invoices received by Cartus vendors, but not yet invoiced to BearingPoint nor formally booked on its accounting system, and $325,000 in anticipated invoices that Cartus would receive from their vendors). BearingPoint was forced to pay the December Wire Payment because approximately 100 employees were in the midst of relocating. Cartus agreed to monitor the actual disbursements made, and would adjust the amounts accordingly.

---

[4] Either party could terminate the Agreement with written notice to the other party, with the effective date being 60 days after the date on which the termination notice is mailed, or a later date as stated in the notice. However, either party could immediately terminate in its sole determination if the other party's "financial condition has or may deteriorate such that its ability to pay the sums due or to become due . . . may be delayed or nonexistent." Agreement, ¶ 18. BearingPoint's financial situation had certainly declined, but there was no evidence to suggest that the company was unable to pay amounts due or that would be due to Cartus.

Dallas 301810v8

23. On December 22, 2008, BearingPoint sent Cartus the December Wire Payment and executed a letter agreement whereby Cartus would process relocation services already in progress for a wind-down period through January 15, 2009, and referred any requests for new services to BearingPoint.

24. After the completion of the wind-down period on January 15, 2009, Cartus refused to provide BearingPoint with a refund and/or reduced fees for a portion of the December Wire Payment consisting of services relating to cross-border relocations which had not been fully performed. In effect, a portion of the December Wire Payment was an overpayment from BearingPoint for these unperformed services. For example, at least $367,000 had been unaccounted for. By this time, BearingPoint's financial situation had further declined, and the company faced the difficult choice of internally assuming an administrative burden of completing certain cross-border services of ongoing relocations, or transitioning them to a new vendor at much higher cost. On January 20, 2009, Cartus denied BearingPoint a refund or reduced fees for the unperformed services, thereby further penalizing BearingPoint for a termination that Cartus initiated on an accelerated basis.

25. Only after further negotiations, Cartus agreed on January 22, 2009 to provide a full accounting of all services performed and unperformed. However, even by early February 2009, Cartus had not yet provided a sufficient reconciliation, and explained that their delay was because of Cartus' own process of soliciting and booking invoices from vendors into Cartus' billing system. Only after BearingPoint involved external counsel and insisted that Cartus expedite its own process did Cartus finally deliver an accurate accounting record. The ultimately agreed upon refund due to BearingPoint was in the amount of $28,576.11 (the "Refund").

Despite multiple requests, BearingPoint did not receive the Refund until December 18, 2009, nearly a year after the December Wire Payment.

26. In addition to the December Wire Payment, BearingPoint paid an additional $314,156 (the "Additional Payments") to Cartus on November 25, 2008 and twice on December 2, 2008. The Additional Payments were all within the ninety (90) days prior to the Petition Date.

## COUNT I: AVOIDANCE AND RECOVERY OF PREFERENTIAL PAYMENT TRANSFERS

27. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 to 26 of this Complaint as though they were set forth in this cause of action. On or within ninety (90) days before the filing of the petition, BearingPoint made certain payment transfers to Cartus totaling $1,760,674 (the "Payment Transfers"). A schedule of the Transfers is annexed hereto as Exhibit "1" and incorporated herein for all purposes.

28. The Payment Transfers constituted transfers of an interest in property of BearingPoint.

29. At the time the Payment Transfers were made, Cartus was a creditor of BearingPoint on account of incurred charges under the Agreement.

30. The Payment Transfers were made for and on account of an antecedent debt (the "Debt") owed by BearingPoint to Cartus under the Agreement.

31. The Payment Transfers were made for the benefit of Cartus as a creditor of BearingPoint.

32. At the time of the Payment Transfers, BearingPoint was insolvent.

33. The Payment Transfers also enabled Cartus to receive more than Cartus would have received if: (i) the case were administered under chapter 7 of the Bankruptcy Code, (ii) the Payment Transfers had not been made, and (iii) such creditor had received payment of the Debt

10

to the extent provided in the Bankruptcy Code. In a chapter 7 liquidation, absent the Payment Transfers, Cartus would have received no distribution on account of the Debt.

34. Based on the foregoing, the Payment Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547, and pursuant to 11 U.S.C. § 550, the Liquidating Trustee is entitled to recover $1,760,674 less the Refund for a total of $1,732,097.89 from Cartus, plus interest.

## COUNT II: DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502(d)

35. The Liquidating Trustee repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 to 26 of this Complaint as though they were set forth here.

36. As set forth above, property is recoverable from Cartus under 11 U.S.C. § 550 and Cartus is a transferee of a transfer avoidable under 11 U.S.C. § 547. Cartus has not paid the amount or turned over property for which Cartus is liable to the Debtors or the Liquidating Trustee. Accordingly, pursuant to 11 U.S.C. § 502(d), any and all claims for Cartus must be disallowed. The Liquidating Trustee requests that all claims for Cartus be disallowed.

## PRAYER FOR RELIEF

Based on the foregoing, the Liquidating Trustee requests that the Court enter a judgment against Cartus for:

(a) avoidance and recovery of the Transfers in the amount of $1,732,097.89 or the value of such property to Cartus and directing Cartus to pay the Liquidating Trustee $1,732,097.89;

(b) reasonable attorney's fees;

(c) pre-judgment interest;

(d) costs of suit; and

(e) such other and further relief, both at law and in equity, as the Court may deem just and proper.

Dated: May 28, 2010
New York, New York

    /s/ Peter S. Goodman

Peter S. Goodman (PG-3939)
Sachin S. Bansal (SB-0283)
MCKOOL SMITH P.C.
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9200
Facsimile: (212) 402-9444

– and –

Basil A. Umari (*pro hac vice*)
Nicholas Zugaro (*pro hac vice*)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

*Counsel to the Liquidating Trustee*

12

Dallas 301810v8

EXHIBIT 1

## CARTUS CORPORATION Combined Payment Listing

| Date | Payment # | Payment Type | Payment Amount |
|---|---|---|---|
| 11/25/2008 | 7193.88 | WIRE | $227,333 |
| 12/2/2008 | 7229.85 | WIRE | $3,656 |
| 12/2/2008 | 7229.88 | WIRE | $83,167 |
| 12/22/2008 | 7308 | WIRE | $1,446,518 |
| 4 | | | $1,760,674 |